UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LINDA THOMAS,

               Plaintiff,

        v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

              Defendant.

08 Civ. 8444 (PGG)

**MEMORAUNDUM OPINION &
ORDER**

PAUL G. GARDEPHE, U.S.D.J.:

       Linda Thomas, proceeding pro se, brings this action pursuant to 42 U.S.C

§ 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security

denying her application for Supplemental Security Income ("SSI") benefits.  The Commissioner

has moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  Thomas has not

opposed the Commissioner's motion.  For the reasons set forth below, the Commissioner's

motion is GRANTED.

## BACKGROUND

       On April 22, 2003, Thomas filed an application for SSI benefits, alleging that she

was totally disabled as of May 1, 1989.[1]  (R. 12, 25)  Thomas's application was denied on initial

review.  (R. 26-29)  She then requested a hearing before an Administrative Law Judge.  (R. 30)

Hearings were held on March 20, 2006, and May 17, 2006, before Administrative Law Judge

Deirdre R. Horton (the "ALJ") but were adjourned to allow Thomas to secure legal

representation and to allow the ALJ to gather necessary records.  (R. 342-57)

---

[1]  Thomas also applied for SSI benefits on March 15, 2002.  (Administrative Record ("R.") 24)
That application was denied in August 2002 and is not at issue in this proceeding.  (R. 362-63;
Cmplt. ¶¶ 7-8)

On December 20, 2006, the ALJ held a hearing to consider Thomas's application. (R. 358-79)  Thomas appeared with her attorney, Michael T. Sullivan.  (R. 358)  On February 23, 2007, the ALJ issued a decision concluding that Thomas is not disabled under Section 1614(a)(3)(A) of the Social Security Act and denying her application for SSI benefits.  (R. 9-23)  Thomas sought relief from the Appeals Council, but the Council denied the request for review on July 25, 2008.  (R. 5-8)  Thomas filed this action pursuant to 42 U.S.C § 405(g) on September 15, 2008.  Thomas claims that she has been entitled to receive disability insurance benefits and/or SSI benefits since 1988 because of mental disabilities, asthma, high blood pressure, memory problems, a knee injury, gall bladder problems, and arthritis.  (Cmplt. ¶ 4)

## I.  THOMAS'S PERSONAL AND VOCATIONAL HISTORY

Thomas was born on July 18, 1957, in Brooklyn, New York.  (R. 364)  She attended school through the eleventh grade and earned a GED in 1979.  (R. 107, 375)  For much of her life, she has abused alcohol, and used marijuana and cocaine.  (R. 376-77)  Thomas lives alone but receives modest financial assistance from her boyfriend and her daughter.  (R. 364-65, 375)  She also receives welfare payments.  (R. 375)

In applying for SSI benefits, Thomas indicated that she was able to take care of herself, prepare her meals, and do household chores.  (R. 121-23)  She uses public transportation and handles her own finances.  (R. 123-24)

Thomas worked as a supermarket cashier from approximately April 1980 to July 1983.  (R. 102, 366)  She appears to have been unemployed from 1983 until 2001, when she worked for two months as a maintenance worker at a courthouse.  (R. 102, 366)

Between 2003 and 2005, Thomas shampooed, styled, and braided hair in her home, earning between $35 and $60 per customer and seeing five to six customers per week.  (R.

370-72, 375)  Thomas testified that her earnings were minimal, but Social Security Administration's records show that she earned $9,674 in 2003 and $9,328 in 2004.  (R. 95)  At the December 2006 hearing, Thomas testified that she had filed tax returns showing this income but explained that she had inflated her earnings in order to boost her earned income tax credit and tax refund.  (R. 373-74, 361-62)

## II.   THOMAS'S MEDICAL HISTORY

Thomas suffers from high blood pressure, asthma and arthritis in her right hand, and has trouble sleeping.  She has a "problem with crowds of people" and "problems with [her] nerves."  She also has trouble getting along with others and with concentrating.  Thomas hallucinates and hears voices approximately once a week, and feels anxious "every couple of days."  (R. 367-69)

### A.   Physical Condition

Thomas has received routine medical care at Soundview Health Center[2] since 2000 (R. 190-251), and has been treated there for occasional respiratory problems (R. 225, 227, 230, 234-35), hypertension (R. 226-29, 237), a painful callus on her left heel (R. 236), and knee, hand, and arm pain.

In April 2000, Thomas complained of bilateral knee pain to a Soundview physician.  An x-ray examination of Thomas's knees revealed "no evidence of fracture, dislocation or effusion," however.  (R. 245, 247, 288)  In March 2002, Thomas complained of right arm pain and stiffness, but when she returned in April 2002, she did not complain about this condition.  (R. 223-24)  In June 2002, Thomas returned to Soundview with complaints of right hand and arm pain.  (R. 221)  The physician who examined her, however, found no

---

[2] Soundview Health Center is now known as Soundview Healthcare Network.  See, e.g., R. 200.

inflammation, and when Thomas returned to Soundview in July 2002, she did not complain of hand or arm pain.  (R221)

On July 7, 2003, Dr. Peter Graham, a specialist in internal medicine, examined Thomas in connection with a referral by the Office of Disability Determinations.  (R. 135) Thomas told Dr. Graham that she spends her days doing light activities and "has no difficulty dressing, bathing, toileting or grooming."  (R. 135)  She also described her psychiatric history and drug abuse, including twelve years of cocaine use.  (R. 135-36)

Dr. Graham concluded that Thomas was "well-developed, well-nourished, appearing stated age and in no acute distress.  Behavior is appropriate.  Mood and affect are normal.  Communication is adequate with no impairment of speech.  [Thomas] walks normally. Station is normal.  [Thomas] is able to dress and undress without difficulty.  [Thomas] is able to get on and off the examination table without difficulty."  She had a "normal range" of spinal motion, clear respiration, full range of motion in her joints, and adequate muscle strength.  Dr Graham detected no abnormalities in her heart function.  Thomas was "oriented and alert," and demonstrated an ability to "sit, stand, walk, lift, carry, handle objects, hear and speak."  She presented with hypertension, controlled by medication, and reported a history of schizoaffective disorder, drug abuse and asthma.  Dr. Graham saw her prognosis as stable.  He did note that in light of her history of asthma, Thomas should avoid extreme heat and cold, humidity, and fumes/odors.  (R. 136-38)

Dr. Kusum Walia issued a "Physical Residual Functional Capacity Assessment" of Thomas in 2003.  (R. 166-72)  Dr. Walia found that Thomas had no exertional, postural, manipulative, visual or communication limitations.  She was "well developed, well nourished"

and had a normal range of motion in her neck and extremities.  (R. 167)  Dr. Walia found her reported limitations "not to be fully credible."  (R. 171)

On March 19, 2004, Thomas sought treatment at Soundview for numbness and pain in her right hand and arm.  (R. 205)  A March 30 radiologist's report, however, showed no abnormalities in Thomas's right hand, shoulder or elbow.  (R. 264)  On April 15, 2004, Thomas was examined by a physician in the Clinical Neurophysiology Laboratory at Montefiore Medical Center.  (R. 260-261)  At that time, Thomas complained of right hand cramping and pain, occasional numbness and tingling in her fingers, mild neck discomfort, and pain from her knee to her foot in her right leg.  (R. 260)  Upon examination, Thomas's motor strength was rated normal, except for slight weakness in her thumb muscle.  (R. 260)  The electrophysiologic study of Thomas was normal.  (R. 261)  On April 23, 2004, Thomas returned to Soundview with complaints of right hand pain; x-rays of her hand showed no abnormality.  (R. 203)

On November 16, 2004, Dr. Sapana Shah, a specialist in internal medicine at Soundview, prepared a "Medical Source Statement" concerning Thomas's ability to perform physical work-related activities.  (R. 162-65)  Dr. Shah found that Thomas has no limitations in her ability to lift, carry, stand, walk, sit, push or pull and that she could occasionally climb, kneel, crawl, or stoop.  (R. 162-63)  Dr. Shah also noted that Thomas suffered from occasional limitations in her ability to perform various manipulative functions.  (R. 164)  Because of Thomas's asthma, Dr. Shah indicated that she would be limited in her ability to work in environments with dust, humidity and fumes.  (R. 165)

On August 10, 2005, Thomas returned to Soundview and requested Tylenol for body pain.  (R. 199)  On September 12 and November 30, 2005, Thomas was seen at Soundview for complaints of low back pain and was prescribed Motrin.  (R. 192, 196)  On April 20, 2006,

Thomas was seen at Soundview again and complained of hand and arm pain; the note from that visit indicates that her prescriptions were refilled.  (R. 191).

On April 20, 2006, Dr. Shah completed a "Physician's Report of Disability Due to Physical Impairment" form.  (R. 182-88)  Dr. Shah noted that she had seen Thomas approximately every six months since 2004.  (R. 182)  Dr. Shah reported that Thomas's hypertension did not limit her activities and that her asthma was "well controlled."  Although Thomas had arthritis pain in her hands and shoulder pain, Dr. Shah found that Thomas could continuously lift and carry up to five pounds and could continuously use her hands for gross manipulation during an eight-hour work day.  Lifting or carrying additional weight, and use of her right hand for fine manipulation and pushing and pulling, however, would be  possible only occasionally.  (R. 183, 185-86)  Thomas faced mild restrictions in "being around moving machinery" and exposure to "marked changes in temperature and humidity," and moderate restrictions with respect to exposure to dust, fumes, gases, and noxious odors.  (R. 187)

On May 4, 2006, Thomas returned to Soundview complaining of knee and arm pain.  (R. 190)  The medical notes concerning this visit indicate that Thomas had normal range of motion in her right arm and was able to perform daily living activities despite her pain.  (R. 190)

**B.**     **Mental Condition**

On January 6, 1999, Thomas was seen by a psychiatrist at Soundview-Throgs Neck Community Mental Health Center.  (R. 314-17)  Thomas was diagnosed with "major depression" with "psychotic features."  The psychiatrist recommended individual and group psychotherapy and anti-depressant and anti-psychotic medication.  (R. 317)

On August 1, 2003, Dr. Kusum Walia issued a report finding that Thomas's mental disorder caused only a "mild" degree of limitation on her daily living activities, her

ability to maintain social functioning, and her ability to maintain concentration, persistence or pace.  (R. 19, 145, 155)  Dr. Walia also concluded that Thomas was either "not significantly limited" or only "moderately limited" with respect to a number of criteria measuring understanding and memory, sustained concentration and persistence, and ability to adapt.  (R. 159-60)  Dr. Walia further found that Thomas was "not significantly limited" in a number of areas measuring social interaction.  (R. 160)

In a March 20, 2006 report, social worker Leslie Lind-Delgado and Dr. Tara Lovings indicated that Lind-Delgado was seeing Thomas on a biweekly basis for verbal therapy, and Dr. Lovings was seeing Thomas on a monthly basis for medication management.  Thomas had sought this treatment for "symptoms of depression, irritability, poor sleep, auditory hallucinations, [and] suicidal & homicidal ideation."  (R. 181)  Their report states that Thomas is taking a variety of psychiatric medications for her major depressive disorder.  Lind-Delgado and Lovings administered a "Global Assessment of Functioning" ("GAF")[3] test to Thomas; she scored at 55, which indicates moderate symptoms or difficulty in functioning.[4]  (R. 181)  Lind-Delgado and Lovings further state that "[d]ue to Ms. Thomas's mental and emotional state she is

---

[3]  "GAF rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning.  A GAF in the range of 61 to 70 indicates '[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.'"  Zabala v. Astrue, 595 F.3d 402, 405 n.1 (2d Cir. 2010) (quoting American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 34 (4th ed. rev. 2000)).

[4]  "GAF in the range of 51 to 60 indicates '[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).'"  Zabala, 595 F.3d at 406 n.3 (quoting DSM-IV at 34).

unable to work at this time.  Her condition impairs her ability to effectively function in any work setting."  (Id.)

On May 3, 2006, Dr. Lovings completed a "Physician's Report For Claim Of Disability Due To Mental Impairment."  (R. 173-80)  Dr. Lovings concluded that Thomas suffers from bipolar disorder (R. 173), and that her symptoms include "periods of mood irritability marked by depressive symptoms," and "occasional" auditory hallucinations.  (R. 174)  Dr. Lovings described Thomas's mental status as "neutral mood, anxious affect . . . normal tone, thought process mostly logical but at times disorganized/distracted."  (R.174)  Dr. Lovings further indicated that Thomas would have difficulty travelling alone to work on a daily basis and that she was "extremely limited" in a number of categories relating to sustained concentration and persistence.  (R. 176-78)  However, Thomas was only "moderately limited" in her ability to understand and remember very short and simple instructions.  (R. 177)

Lind-Delgado also saw Thomas on May 3, 2006.  Her notes from that visit describe Thomas as "neat and clean" and "with full range [of] affect."  Although Thomas reported being in a "depressed mood," she had not experienced hallucinations for two weeks and had been adhering to her regime of prescription medications.  (R. 313)

Lind-Delgado saw Thomas again on June 13, 2006.  Thomas was again "neat and clean" and displayed a "full range [of] affect."  She reported being in a "depressed mood" and only "semi-adherence" to her prescribed regimen of medications.  Thomas denied audio or visual hallucinations.  (R. 310)

On October 2, 2006, Dr. Lovings completed a "Supplemental Questionnaire As To Residual Functional Capacity."  This form required Dr. Lovings to indicate Thomas's level of impairment in a number of categories.  Dr. Lovings described the degree of Thomas's

impairment as (1) moderately severe in connection with Thomas's ability to relate to other

people; (2) as moderate in connection with her daily activities and interests; and (3) as mild in

connection with her personal habits.  Dr. Lovings also indicated that Thomas suffers from

moderately severe limitations in comprehending and following instructions, performing work

requiring frequent contact with others, and performing varied tasks.  Thomas is only moderately

limited in her ability to perform work that involves (1) minimal contact with others, and (2)

complex and repetitive tasks.  Thomas is mildly limited in performing simple tasks.  Based on

these evaluations, Dr. Lovings concluded that Thomas is severely limited in her ability to

perform full time work in a routine setting.  (R. 336-37)

## DISCUSSION

The Commissioner has moved for judgment on the pleadings, arguing that the

ALJ's decision that Thomas is not disabled under Section 1614(a)(3)(A) of the Social Security

Act is supported by substantial evidence.

"'A district court may set aside the Commissioner's determination that a claimant

is not disabled only if the factual findings are not supported by substantial evidence or if the

decision is based on legal error.'"  Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008) (quoting

Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000); see also 42 U.S.C § 405(g).

Substantial evidence is "'more than a mere scintilla.  It means such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Burgess, 537

F.3d at 127 (quoting Halloran v. Barnhard, 362 F.3d 28, 31 (2d Cir. 2004)).

"[T]he findings of the Commissioner as to any fact, if supported by substantial

evidence, are conclusive. . . ."  Santiago v. Astrue, No. 06 Civ. 7860, 2007 WL 1982747, at * 3

(S.D.N.Y. July 3, 2007) (citing Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir.1995)).  "If the

reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists."  Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)).  "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision."  Johnson, 563 F. Supp. 2d at 454; see also Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (noting that the role of the appellate court, like the district court, is to conduct a "plenary review of the administrative record" and not "to determine de novo whether [the claimant] is disabled").

## I.   THE ALJ'S DETERMINATION THAT THOMAS IS NOT DISABLED IS SUPPORTED BY SUBSTANTIAL EVIDENCE

A claimant is considered disabled under the Social Security Act (the "Act") if he or she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  "A 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 423(d)(3).

The claimant's impairments must be of

such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).  Under the Act, "'work which exists in the national economy' means

work which exists in significant numbers either in the region where [the claimant] lives or in

several regions of the country."  Id.

The Commissioner is required to follow a five-step process in evaluating

disability claims.  See 20 C.F.R. §§ 404.1520, 416.920.  The Second Circuit has outlined the

required analysis as follows:

> "First, the Commissioner considers whether the claimant is
> currently engaged in substantial gainful activity.  Where the
> claimant is not, the Commissioner next considers whether the
> claimant has a 'severe impairment' that significantly limits her
> physical or mental ability to do basic work activities.  If the
> claimant suffers such an impairment, the third inquiry is whether,
> based solely on medical evidence, the claimant has an impairment
> that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. . . . Assuming
> the claimant does not have a listed impairment, the fourth inquiry
> is whether, despite the claimant's severe impairment, she has the
> residual functional capacity to perform her past work.  Finally, if
> the claimant is unable to perform her past work, the burden then
> shifts to the Commissioner to determine whether there is other
> work which the claimant could perform."

Jasinski v. Barnhart, 341 F.3d 182, 183-184 (2d Cir. 2003) (quoting Tejada v. Apfel, 167 F.3d

770, 774 (2d Cir. 1999)); see also 20 C.F.R. §§ 404.1520, 416.920.  The claimant bears the

burden of proof as to steps one through four; the Commissioner bears the burden of proof as to

step five.  Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004).

A.   **Substantial Gainful Activity**

Thomas met her burden of proof with regard to the first step of the analysis:

establishing that she is not currently engaged in any "substantial gainful activity."  See Jasinski,

341 F.3d at 183-184; R. 14.  The ALJ concluded that Thomas had not engaged in substantial

gainful activity since May 1, 1989, the alleged date of the onset of her disability.  (R. 14)  The

ALJ's determination was based on Thomas's repeated statements to this effect.  (Id.)  The ALJ

noted that Social Security Administration records indicate that Thomas earned "above substantial

gainful activity levels from 2003 through 2005" but acknowledged that Thomas had testified that

these records were based on false income tax returns Thomas had filed for those years.  (Id.)

Under the circumstances, the ALJ concluded that she could not find – based on the SSA records

– that Thomas had been engaged "in substantial gainful activity."[5]  (Id.)

       **B.**     **<u>Severe Impairments</u>**

       Thomas also established that she suffers from a "'severe impairment' that

significantly limits her physical or mental ability to do basic work activities."  See <u>Jasinski</u>, 341

F.3d at 183-184; R. 14; 20 C.F.R. § 416.920(c).  Basic work activities are:

> the abilities and aptitudes necessary to do most jobs.  Examples of
> these include – (1) Physical functions such as walking, standing,
> sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2)
> Capacities for seeing, hearing, and speaking; (3) Understanding,
> carrying out, and remembering simple instructions; (4) Use of
> judgment; (5) Responding appropriately to supervision, co-workers
> and usual work situations; and (6) Dealing with changes in a
> routine work setting.

20 C.F.R. § 416.921(b).

       The ALJ concluded that Thomas was severely impaired by asthma, hypertension

and a depressive disorder.  (R. 14).  In making this determination, the ALJ relied on Thomas's

medical records from Soundview, including notes from Thomas's visits and laboratory test

results.  (R. 14) (citing R. 189-293).  The ALJ also cited records concerning Thomas's visits to

the Soundview-Throgs Neck Community Mental Health Center, including Dr. Lovings and Lind-

Delgado's reports.  (R. 14) (citing R. 294-334)

---

[5]  The ALJ noted, however, that Thomas's submission of false and fraudulent income tax returns
"negatively impact her overall credibility."  (R. 14)

The ALJ concluded, however, that Thomas had not established that her "history of multiple joint pains, including the hands, arms, back and legs secondary to arthritis," constitutes a severe impairment.  (R. 14)  The ALJ noted that "a review of the treatment record fails to document any positive findings consistent with a diagnosis of arthritis."  (Id.)  Moreover, although Thomas occasionally sought treatment for numbness or pain (R. 190, 191, 203, 205, 260), diagnostic testing and x-rays revealed no abnormalities (R. 261, 264), and several physicians noted that Thomas's motor strength and ability to perform daily functions is normal. (R. 138, 190, 260)

The ALJ noted that Dr. Shah had indicated in an April 2006 report that Thomas suffered "pain in hands and swelling due to arthritis."  (R. 183)  Treatment records failed to document any objective evidence of this diagnosis, however (R. 15, 138, 190, 260, 261, 264), and Dr. Shah himself states in his April 2006 report that his findings are "based mainly on subjective symptoms presented by [the] patient."  (R. 188)  The April 2006 report also supports the ALJ's conclusion that Thomas's joint pain is not a severe impairment:  at that time, Dr. Shah found that Thomas could continuously lift and carry up to five pounds and could continuously use her hands for gross manipulation.  (R. 185-86)

Substantial evidence supports the ALJ's conclusion that Thomas's history of joint pain and claimed arthritis do not constitute severe impairments.   The administrative record demonstrates that Thomas is able to perform a number of basic work activities despite the pain she claims to suffer, and the record contains no objective evidence of arthritis.

**C.**     **Impairments Listed in the Code of Federal Regulations**

Having decided that Thomas suffers from multiple severe impairments (R. 14), the ALJ next sought to determine "whether, based solely on medical evidence, the claimant has

an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1."  See Jasinski, 341 F.3d at 183-

184; R. 15.  This section of the Code of Federal Regulations lists impairments that constitute

disabilities.  20 C.F.R. § 404, subpt. P, app. 1.

   The ALJ concluded that Thomas's severe impairments – asthma, hypertension

and a depressive disorder – do not meet the criteria of any of the impairments listed in the Code

of Federal Regulations.  (R. 15)  The ALJ's determination was based on Dr. Walia's reports.  In

assessing Thomas's "residual functional capacity" in relation to her hypertension and asthma, Dr.

Walia found that Thomas's impairments do not restrict her physical activities.  (R. 166-72)

While Thomas's asthma imposes limitations on the type of environments in which she can work,

Dr. Walia determined that Thomas's asthma was not a disabling condition.  (R. 167, 170)  With

respect to Thomas's bipolar disorder, Dr. Walia concluded that this impairment does not

constitute a disability under the Code of Federal Regulations.  (R. 145-61)  The ALJ rejected Dr.

Lovings's finding that Thomas suffers from a mental affective disorder that is one of the list of

impairments set forth in the Code of Federal Regulations.  (R. 15)

   An affective disorder is "[c]haracterized by a disturbance of mood, accompanied

by a full or partial manic or depressive syndrome."  20 C.F.R. § 404, subpt. P, app. 1, 12.04.  In

order to be considered a disability under 20 C.F.R. § 404, subpt. P, app. 1, an affective disorder

must meet one of two sets of criteria.  First, an affective disorder must cause "medically

documented persistence, either continuous or intermittent," of one of a number of symptoms of

depressive syndrome, manic syndrome, or bipolar syndrome, as well as at least two of four

categories of restrictions and difficulties that might result from such disorders.  20 C.F.R. § 404,

subpt. P, app. 1, 12.04(A), (B).

Alternatively, an affective disorder constitutes a disability under the Code of Federal Regulations where the claimant presents a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support."  The claimant must further demonstrate "[r]epeated episodes of decompensation, each of extended duration; or [] [a]residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or [] [c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement."  20 C.F.R. § 404, subpt. P, app. 1, 12.04(C).

After reviewing the treatment records provided by Dr. Lovings, Thomas's treating psychiatrist, and Lind-Delgado, the social worker conducting Thomas's therapy sessions, the ALJ concluded that Thomas's depressive disorder does not meet the criteria for an affective disorder.  (R. 15)  In making this determination, the ALJ noted that Thomas's condition "does not manifest clinical signs" and that her treatment records do not support a finding that Thomas meets the criteria for having an affective disorder.  (Id.)

The ALJ's conclusion is supported by substantial evidence, including the treatment records of Dr. Lovings and Lind-Delgado.  For example, in May 2006, Dr. Lovings diagnosed Thomas as suffering from bipolar disorder but described her mental status as "neutral mood, anxious affect . . . normal tone, thought process mostly logical but at times disorganized/distracted."  (R. 174)  Dr. Lovings further found that although Thomas was "extremely limited" in a number of categories relating to sustained concentration and

persistence, she was only "moderately limited" in her ability to understand and remember very short and simple instructions.  (R. 176-78)

In an October 2006 report, Dr. Lovings described as "moderate" the restriction on Thomas's daily activities and interests resulting from her mental disorders.  (R. 336)  Dr. Lovings further indicated that Thomas was only moderately limited in her ability to perform work (1) where contact with others would be minimal; and (2) that involved complex and repetitive tasks.  Moreover, Thomas was only mildly limited in performing simple tasks.  (R. 336-37)  Taken together with the assessments made by Dr. Walia, these reports constitute substantial evidence in support of the ALJ's decision that Thomas does not suffer from an affective disorder listed in the Code of Federal Regulations.

**D.      Residual Functional Capacity to Perform Past Work**

Because the ALJ concluded that Thomas did not suffer from a listed impairment, she proceeded to evaluate whether Thomas retains "the residual functional capacity to perform her past work."  See Jasinski, 341 F.3d at 183-84; see 20 C.F.R. § 404.1520(e).

The ALJ concluded that Thomas "has the residual functional capacity to perform work at all exertional levels with avoidance of prolonged exposure to dust, fumes, odors, gases, poor ventilation, heat and cold extremes and wetness/humidity and work requiring no more than simple (i.e., 1-2 step) instructions."  (R. 15)  The ALJ further explained that while Thomas's "medically determinable impairments could reasonably be expected to produce the alleged symptoms . . . [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible."  (R. 16)

Consistent with the methodology set forth in the Code of Federal Regulations, the ALJ "consider[ed] all [of Thomas's] symptoms, including pain, and the extent to which

[Thomas's] symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence."  20 C.F.R. § 416.929(a).  "[S]tatements about [a claimant's] pain or other symptoms will not alone establish that [she is] disabled; there must be medical signs and laboratory findings which show . . . a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged. . . ."  Id.  Similarly, symptoms "will not be found to affect [the claimant's] ability to do basic work activities unless medical signs or laboratory findings show that a medically determinable impairment(s) is present."  20 C.F.R. § 416.929(b).

Given that "symptoms sometimes suggest a greater severity of impairment than can be shown by the objective medical evidence alone," ALJs may consider a variety of factors in evaluating a claimant's symptoms, including "(i) [claimant's] daily activities; (ii) the location, duration, frequency, and intensity of [claimant's] pain or other symptoms; (iii) precipitating and aggravating factors; (iv) the type, dosage, effectiveness, and side effects of any medication [claimant] takes or [has] taken to alleviate [] pain or other symptoms; (v) treatment, other than medication, [claimant] receive[s] or [has] received for relief of [] pain or other symptoms; (vi) any measures [claimant] uses or [has] used to relieve [] pain or other symptoms (e.g., lying flat on [his or her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) other factors concerning [] functional limitations and restrictions due to pain or other symptoms."  20 C.F.R. 416.929(c)(3).

## 1.     __Thomas's Credibility__

In evaluating subjective evidence, ALJs are permitted to make credibility findings concerning a claimant's statements about her symptoms and to consider objective evidence, the claimant's demeanor, and other indicia of credibility.  See Tejada v. Apfel, 167 F.3d 770, 776 (2d Cir. 1999) (citing Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985) (noting

that after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility, an ALJ, in resolving conflicting evidence, may decide to discredit the claimant's subjective estimation of the degree of impairment)).  "Conclusory findings of a lack of credibility will not suffice; rather, an ALJ's decision 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.'"  Rojas v. Astrue, No. 09 Civ. 6698 (DLC), 2010 WL 1047626, at *5 (S.D.N.Y. Mar. 22, 2010) (quoting Soc. Sec. Ruling 96-7p, 61 Fed. Reg. at 34, 484 (S.S.A. July 2, 1996)).

   "Deference should be accorded the ALJ's determination because [s]he heard plaintiff's testimony and observed [her] demeanor."  Gernavage v. Shalala, 882 F. Supp. 1413, 1419 n. 6 (S.D.N.Y. 1995) (citing Mejias v. Social Sec. Admin., 445 F. Supp. 741, 744 (S.D.N.Y. 1978); Wrennick v. Sec'y of Health, Educ. and Welfare, 441 F. Supp. 482, 485-86 (S.D.N.Y. 1977)).  "[A] determination of credibility will only be set aside if it is not set forth 'with sufficient specificity to enable [a reviewing court] to decide whether [it] is supported by substantial evidence.'"  Rojas, 2010 WL 1047626, at *6 (quoting Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir.1984)).

   Here, the ALJ discounted Thomas's "subjective and self-reported complaints" and "the conclusions of her treating clinicians who base[d] their treatment on [her statements]."  (R. 21)  In making this determination, the ALJ noted that Thomas had admitted filing false and fraudulent tax returns in order to obtain tax refunds, and concluded that "[t]his demonstrates she is will[ing] to manipulate the system in order to obtain monetary gain."  (Id.)  The ALJ also noted that Thomas's long history of drug abuse undermines her credibility.  (Id.)  The ALJ found

that Thomas's "testimony as to her inability to perform all work activity [is] not credible given the lack of objective evidence documenting significant clinical/laboratory findings combined with the activities she has reported and testified to being able to perform despite her impairments." (Id.)

The ALJ's determination as to Thomas's credibility is set forth with sufficient specificity for this Court to conclude that it is based on substantial evidence. See Ferraris, 728 F.2d at 587. Moreover, as discussed below, see infra pp. 20-22, Thomas's statements about her physical and mental conditions were often contradictory and inconsistent with the medical evidence.

### 2.    <u>Thomas's Physical Capacity</u>

The ALJ concluded that Thomas's physical impairments do not prevent her from performing work at all exertional levels. (R. 16-18) While the ALJ considered Thomas's testimony that she suffers from hypertension, asthma and right hand cramps (R. 16, 369), the ALJ noted that the record does not provide any objective medical evidence indicating a medical cause of Thomas's alleged hand, arm, back and leg pain or cramps. (R. 17, 260-64) Moreover, Thomas's treating physician stated that her hypertension does not limit her activities and that her asthma is "well controlled." (R.183)

Several physicians have found that Thomas's motor strength and ability to perform daily functions is normal. Dr. Shah's November 2004 report indicates, for example, that Thomas is not limited in her ability to lift, carry, stand, walk, sit, push or pull and that she should occasionally be able to climb, kneel, crawl and stoop. (R. 162-63) In a 2006 report, Dr. Shah indicated that Thomas could continuously lift and carry up to five pounds and could continuously

use her hands for gross manipulation during an eight hour workday.[6]  (R. 185-86)  In his

evaluation, Dr. Graham stated that Thomas "is able to sit, stand, walk, lift, carry, handle objects,

hear and speak."  (R. 138)  Dr. Walia similarly found that Thomas did not suffer from any

physical restrictions.  (R. 167)

      Indeed, Thomas herself has indicated that her daily activities are not impaired by

physical ailments.  In 2003, she told Dr. Graham that she is able to do light activities and "has no

difficulty dressing, bathing, toileting or grooming."  (R. 135)  In filling out a Division of

Disability Determinations form, Thomas noted that she cooks and cleans for herself (R. 121-22),

shops (R. 124), and is able to do all of her household chores.  (R. 123)  Thomas also testified that

she had worked as a hairdresser after the onset of her alleged disability.  (R. 370-72, 375)

      While Thomas's asthma requires her to avoid "exposure to environmental

irritants, poor ventilation, temperature extremes and wetness/humidity" (R. 18), the proof

outlined above constitutes substantial evidence that Thomas, despite any potential physical

impairments, has the residual functional capacity to perform work at all exertional levels.

### 3.    Thomas's Mental Capacity

      In evaluating the effect of Thomas's mental condition on her residual functional

capacity, the ALJ focused on criteria set forth in the Code of Federal Regulations that "describe

impairment-related functional limitations that are incompatible with the ability to do any gainful

activity."  (R. 18-22); 20 C.F.R. § 404, subpt. P, app. 1, 12.00.

      "B" criteria include "marked restriction of activities of daily living," "marked

difficulties in maintaining social functioning," "marked difficulties in maintaining concentration,

---

[6]  Although Dr. Shah set forth some limitations on Thomas's physical functioning, see supra p. 6, the ALJ concluded that "the objective medical evidence . . . does not support significant limitation in functioning."  In reaching this conclusion, the ALJ noted that Dr. Shah's 2006 report was "based mainly on subjective symptoms provided by patient."  (R. 17) (citing R. 188)

persistence, or pace," and "repeated episodes of decompensation, each of extended duration."  20

C.F.R. § 404, subpt. P, app. 1, 12.04(B).

"C" criteria include indicators of a "[m]edically documented history of a chronic

affective disorder" including "repeated episodes of decompensation, each of extended duration,"

"a residual disease process that has resulted in such marginal adjustment that even a minimal

increase in mental demands or change in the environment would cause the individual to

decompensate," and "current history of 1 or more years' inability to function outside a highly

supportive living arrangement, with an indication of continued need for such an arrangement."

20 C.F.R. § 404, subpt. P, app. 1, 12.04(C).

In evaluating the "B" criteria, the ALJ concluded that Thomas's "testimony and

reports regarding the severity of her depression and anxiety is inconsistent with the medical

evidence of record."  (R. 18)  In reaching this conclusion, the ALJ relied on substantial evidence

in the administrative record.

The ALJ cited Dr. Walia's report, which concluded that Thomas's mental

disorder caused only a "mild" degree of limitation on her daily living activities, her ability to

maintain social functioning, and her ability to maintain concentration, persistence or pace.  (R.

19, 145, 155)  Dr. Walia also concluded that Thomas was either "not significantly limited" or

only "moderately limited" with respect to a number of criteria measuring understanding and

memory, sustained concentration, persistence, and ability to adapt.  (R. 159-60)  Dr. Walia

further found that Thomas was "not significantly limited" in a number of capacities measuring

social interaction.  (R. 160)

The ALJ found that the record supported Dr. Walia's conclusions.  The symptoms

Thomas described were "intermittent," and her "condition is stable on her current medication."

(R. 19)  Thomas acknowledges shopping for herself (R. 124), doing routine household chores (R. 123), and handling her own money (R. 124).  Although Thomas testified that she has problems with crowds, with focusing, and with interpersonal relationships (R. 367-68), she has no problems using public transportation on her own (R. 123, 367), reports being able to finish what she starts and to follow spoken and written instructions, and visits with friends and family on a regular basis (R. 125-26).  At the time of the hearing before the ALJ, Thomas had a boyfriend. (R. 375)  She also worked as a hairdresser in her home.  (R. 372)

Although Thomas has been diagnosed with depression and bipolar disorder, the record presents "no evidence of ongoing visits with Dr. Lovings," the treating psychiatrist, which the ALJ reasonably concluded is "inconsistent with [the] allegation of debilitating symptoms." (R. 19)  Indeed, Dr. Lovings' records mainly reflect medication refills, with no ongoing consultations.  (R. 295-309)  Although Thomas began seeing Lind-Delgado, a social worker, in May 2006 – well after the alleged onset of Thomas's disability – Lind-Delgado's notes from Thomas's visits do not describe her as unable to function; to the contrary, Lind-Delgado reported at every visit that Thomas appeared "with full range [of] affect."  (R. 310-13)

With regard to the "C" criteria, the ALJ concluded that "there is no evidence that the claimant experiences symptoms resulting in any periods of decompensation of extended duration, an inability to function outside of a structured environment or an inability to function independently outside the area of [her] home."  (R. 20)  Thomas's ability to perform routine daily activities, see supra pp. 19-22, and her ability to comply with her prescription medication regime (R. 181, 310, 313, 370), support this conclusion.

The ALJ acknowledged but refused to adopt Dr. Lovings' conclusion that Thomas is disabled and unable to work.  (R. 21)  In addressing the role opinion evidence should play in a

disability determination, the Second Circuit has held that "while the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record.  Genuine conflicts in the medical evidence are for the Commissioner to resolve."  Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted).

        The ALJ concluded that Dr. Lovings' opinions were "inconsistent with the overall evidence[,] including her own reports."  (R. 21)  Lovings has repeatedly found that Thomas's mental condition prevents her from working.  (R. 176-78, 181, 337)  However, Lovings has not supported these findings with objective medical evidence.  See id.  Her own reports have described Thomas as having "periods" of depressive symptoms and "occasional" auditory hallucinations (R. 174), and have indicated only moderate or mild limitations on Thomas's ability to understand and remember short and simple instructions, to carry out daily activities and interests, to maintain personal habits, to perform work where contact with others would be minimal, and to perform complex, repetitive and simple tasks.  (R. 177, 336-37)

        Moreover, Dr. Lovings gave Thomas GAF scores of 65 in 1999 and 55 in 2006. (R. 181, 317)  A GAF score of 65 indicates "'[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally [suggests that an individual is] functioning pretty well, [and] has some meaningful interpersonal relationships."  Uffre v. Astrue, No. 06 Civ. 7755 (GWG), 2008 WL 1792436, at *2 n.5 (S.D.N.Y. April 18, 2008) (quoting  DSM-IV at 32). A GAF score of 55 indicates "'moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning.'"  Zabala, 595 F.3d at 406 n.3 (quoting DSM-IV at 34). Both sets of GAF scores are inconsistent with Dr. Lovings' opinion that Thomas is severely

limited in her functional capacity and thus cannot work.

In addition to noting these inconsistencies in Dr. Lovings' reports, the ALJ pointed out that Dr. Lovings' conclusions are based on Thomas's subjective statements. These statements cannot be credited, however, in light of Thomas's lack of credibility. See R. 21 and supra pp. 17-19.

### 4.    Past Relevant Work

One purpose of assessing Thomas's residual functional capacity is to determine whether she is able "to perform her past work." See Jasinski, 341 F.3d at 183-84. In order to be relevant, historical work must have been performed within the past fifteen years, lasted long enough for the claimant to learn to do the work, and constituted "substantial gainful activity." 20 C.F.R. § 416.965(a). Here, the ALJ's determination that Thomas "has not performed work activity at substantial gainful activity levels in the last 15 years" is supported by substantial evidence. (R. 22) Thomas's last period of consistent employment was in the early 1980's. (R. 102, 366) While she worked for two months in 2001 (R. 102, 366), and intermittently did hair styling from 2003 to 2005 (R. 370-72, 375), these activities do not appear to rise to substantial gainful activity levels.

### E.    Work In The National Economy

In the final step of a disability determination, the burden shifts to the Commissioner to demonstrate that there is work in the national economy that the claimant could perform. See Jasinski, 341 F.3d at 183-84. At this stage, "the Commissioner need only show that there is work in the national economy that the claimant can do; he need not provide additional evidence of the claimant's residual functional capacity." Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam). Here, the ALJ determined that Thomas's ability to

"perform work at all exertional levels has been compromised by nonexertional limitations. However, these limitations have little or no effect on the occupational base of unskilled work at all exertional levels."  (R. 22)  After consulting the Medical-Vocational Guidelines of the Social Security Regulations, the ALJ determined that a finding of "not disabled" was appropriate.  (R. 22-23)

The ALJ properly relied on the Medical-Vocational Guidelines in making her determination, insofar as Thomas's non-exertional limitations do not affect her ability to perform unskilled work.  See Zabala, 595 F.3d at 410-11 (finding that the ALJ correctly relied on the Medical-Vocational Guidelines where the claimant had non-exertional limitations that "did not limit her ability to perform unskilled work, including carrying out simple instructions, dealing with work changes, and responding to supervision" and thus "did not result in an additional loss of work capacity. . . .").

The ALJ further weighed Thomas's age, education, work experience and residual functional capacity to conclude that Section 204 of the Medical-Vocational Guidelines provides a framework for the decision as to whether there is work in the national economy Thomas can perform.  (R. 22)  On this basis, the ALJ concluded that Thomas is not disabled.  The Guidelines support this determination, as does the substantial evidence regarding Thomas's functional capacity set forth supra, pp. 19-24.  See 20 C.F.R Part 404, Subpt. P, App. 2 § 204.

**CONCLUSION**

For the foregoing reasons, Defendant's motion for judgment on the pleadings is

GRANTED. The Clerk of the Court is directed to close the case.

It is further ORDERED that the Clerk of the Court serve copies of this Opinion &

Order by certified mail upon Plaintiff pro se and counsel for Defendant at the addresses listed

below.

Dated: New York, New York
       April 7, 2010

                                  SO ORDERED

                                  Paul G. Gardephe
                                  United States District Judge

Copy to:
Linda Thomas (pro se)
2245 Randall Avenue, Apt. # 7J
Bronx, NY 10473

John E. Gura, Jr.,
Assistant U.S. Attorney
U.S. Attorney's Office
Southern District of New York
86 Chambers Street
New York, NY 10007